
**ORIGINAL**

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4685 | **DATE** | 10/18/2001 |
| **CASE TITLE** | ,Ronald T. Bosco, individually and on behalf of all other similarly situated. vs. CTA | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order from bench trial on the papers. Accordingly, the Court directs the Clerk of the Court to enter judgment, plus court costs, in favor of the Defendant, CTA and against Plaintiffs on Plaintiffs' complaint.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | **Document Number** |
| | No notices required. | | | OCT 19 2001 | |
| ✓ | Notices mailed by judge's staff. | | | date docketed | |
| | Notified counsel by telephone. | | | docketing deputy initials | 51 |
| | Docketing to mail notices. | | | 10/17/2001 | |
| ✓ | Mail AO 450 form. | | COPY FOR DOCKETING | date mailed notice | |
| | Copy to judge/magistrate judge. | | 01 OCT 18 PM 4: 55 | | |
| DK | courtroom deputy's initials | | Date/time received in central Clerk's Office | DK mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RONALD T. BOSCO, individually, and on behalf of all others similarly situated, | ) ) ) ) | No. 98 C 4685 |
| Plaintiffs, | ) ) | Magistrate Judge Morton Denlow |
| v. | ) ) | |
| CHICAGO TRANSIT AUTHORITY, | ) ) | **DOCKETED** |
| Defendant. | ) | OCT 1 9 2001 |

## MEMORANDUM OPINION AND ORDER

This case raises an important issue concerning pension rights of current or former employees of the Chicago Transit Authority ("Plaintiffs" or "Employees"). They claim that the Chicago Transit Authority ("Defendant" or "CTA") wrongfully denied their bridge of service applications which would entitle them to greater pension benefits upon retirement.

This case comes before the Court by means of a trial on the papers in which the parties have submitted trial briefs, affidavits, depositions, and supporting exhibits which constitute the record in this case. *See* Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment,* Federal Lawyer, August 1999, at p. 30. *See also, May v. Evansville-Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1115-16 (7th Cir. 1986); *Allen v. United Mine Workers of America,* 726 F.2d 352, 353 (7th Cir. 1984); *Acuff-Rose Music Inc. v. Jostens, Inc.*, 155 F.3d 140, 142 (2nd Cir. 1998); *Nolan v. City of Chicago*, 125 F. Supp.2d 324, 325 (N.D. Ill. 2000). The parties have agreed to proceed in this manner and to waive their right to

present in court testimony. Oral argument was held on September 25, 2001.

The issues presented arise out of Plaintiffs' Verified Class Action Complaint for Violation of Civil Rights. Plaintiffs allege they have a vested property interest in their retirement benefits from their first and second tour of duty with the CTA. The CTA does not dispute that Plaintiffs are entitled to retirement benefits stemming from the Plaintiffs' second tour of duty; however, the CTA does dispute that Plaintiffs are entitled to retirement benefits stemming from their first tour of duty with the CTA.

The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed to be conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed to be findings of fact, they shall be considered findings.

## I. FINDINGS OF FACT

A.    **Parties**

1. Plaintiffs are current or former employees of the CTA. Each Plaintiff had two periods of service with the CTA. Their first period of service was separated from the second period of service by a time period greater than one year. (Def. Resp. ¶ 1).[1]

2. The CTA is a duly organized body politic and corporate and a political subdivision of the State of Illinois created and existing under the Metropolitan Transit Authority Act, 70

---

[1] "Def. Resp." refers to Defendant's Response To The Plaintiffs' Statement Of Facts.

ILCS 3605/1. et seq. (1992).  (Def. Resp. ¶ 2).  The governing and administrative body of the CTA is the seven-member Chicago Transit Board.  70 ILCS 3605/19.  (Pl. Resp. ¶ 2).[2]

3.  Plaintiffs are or were management employees of the CTA. Managerial employees are eligible to participate in two retirement plans, the first is called the Retirement Plan for Chicago Transit Authority Employees ("Retirement Plan") and the second is called the Supplemental Retirement Plan ("Supp. Plan"). Furthermore, Plaintiffs are or will be eligible to receive benefits under the Retirement Plan and the Supp. Plan. (Def. Resp. ¶ 3).

**B.    Retirement Plan**

4.  Pursuant to a collective bargaining agreement, the CTA adopted its Retirement Plan effective June 1, 1949.  The Retirement Plan has been amended from time to time.  The Retirement Plan presented to this Court reflects amendments through December 23, 1993. The Retirement Plan covers all CTA employees, whether union members or not, who meet its requirements.  (Def. Ex. 3).

5.  The Retirement Plan established a Retirement Allowance Committee consisting of ten members.  Five members are appointed by the CTA Board, four are appointed by the unions, and one member is appointed to represent the non-union employees.  (Def. Ex. 3, ¶ 5.1).  The Retirement Plan grants the following powers to the Retirement Allowance Committee:

(1)    to make and enforce such rules and regulations consistent with the

---

[2] "Pl. Resp." refers to Plaintiffs' Response To The CTA's Statement Of Additional Facts In Support Of Its Trial Brief.

provisions of this agreement as in its opinion may be necessary, or desirable, for the carrying out of its duties, and for the efficient administration of the Plan;

(2)   to decide any question arising in the administration, interpretation and application of this Plan;

(3)   to determine, according to the provisions herein set forth, the eligibility of an employee for old-age retirement and disability allowance under this Plan and, if eligible, his rights hereunder;

(4)   to certify to the Trustee the name of each employee eligible for a refund or old-age retirement or disability allowance and the amount payable to him and to rescind such certification in accordance with the provisions of this Plan;

(5)   to approve or deny any application for an optional form of payment or retirement allowances, and to formulate rules with respect to the election of, and payments under, any such optional form of payment, which rules, however, shall not be inconsistent with the provisions of this Plan.

(Def. Ex. 3, ¶ 5.6).

6.   The Allowance Committee has both the continuing statutory and fiduciary obligations to administer the Retirement Plan pursuant to the Metropolitan Transit Authority Pension Fund Act. (Def. Resp. ¶ 7).

7.   The Allowance Committee is responsible for the determination and issuance of retirement allowances, pursuant to the terms of the Retirement Plan. (Def. Resp. ¶ 8).

8.   The Retirement Plan provides for a method of amendment as follows:

This Agreement, as amended, has been in effect from June 1, 1949 to date. This Agreement is part of the Wage and Working Conditions Agreement between the parties hereto. This Agreement can be changed only in accordance with the provisions of the aforesaid Wage and Working Conditions Agreement.

(Def. Ex. 3, ¶ 23.1).

9.   Benefits under the Retirement Plan are calculated based on the employee's

"continuous service" with the CTA only, with certain exceptions not relevant to this issue. (Def. Ex. 3, ¶¶ 3.3, 3.5, 3.6, 3.7, 4.1, 4.2, 4.3).

## C.   Supplemental Plan

10. In contrast to the Retirement Plan, the Supplemental Plan was created by ordinance to provide certain additional benefits for executive employees above a certain grade level. The Supplemental Plan was later amended and restated pursuant to later ordinances. (Def. Ex. 1, Pl. Ex. C). The most recent Restatement is dated January 24, 1991 and contains an undated First Amendment. (Pl. Ex. C).

11. The First Amendment to the January 24, 1991 Restatement creates a new paragraph 15 which provides for an Employee Retirement Review Committee. (Pl. Ex. C, ¶ 5).

12. The Employee Retirement Review Committee of the CTA ("Retirement Review Committee") is a committee of the CTA established to administer the Supp. Plan and the payment of the Supp. Plan benefits. (Def. Resp. ¶ 9).

13. The Retirement Review Committee has both the continuing statutory and fiduciary obligations to administer the Supp. Plan pursuant to the Metropolitan Transit Authority Pension Fund Act, 40 ILCS 5/22-101 (1992). (Def. Resp. ¶ 10).

14. The Retirement Review Committee is responsible for the determination and issuance of retirement allowances pursuant to the agreements that certain management employees, including Plaintiffs, entered into pursuant to the terms of the Supp. Plan. (Def. Resp. ¶11).

15. The Supp. Plan "is subject to the Rules and Procedures adopted by the Employee Retirement Review Committee from time to time heretofore and hereafter interpreting and administering the Supplemental Retirement Plan." (Pl. Ex. C, Supp. Plan 1st Am. ¶ 5).

16. Benefits under the Supp. Plan are generally based on continuous service with the CTA. (Pl. Ex. C, Rest.¶ 5,[3] Supp. Plan 1st Am. ¶ 1; Def. Ex. 5, Rule No. 1,(b)). However, the Supp. Plan also provides benefits for previous "governmental service," meaning, service with the CTA and certain other governmental bodies giving reciprocal pension credit, but only if: 1) there is no more than a 12-month break between the employee's prior service with the governmental body and his service with the CTA and 2) the management employee who wishes to bridge prior governmental service under the Supp. Plan make a contribution to the CTA for the period of prior governmental service. (Pl. Ex. C, Rest. pg. 3, 5, 6, Supp. Plan 1st Am. ¶ 1). Furthermore, "governmental service" is to be "as interpreted by Rules adopted by the Employee Retirement Review Committee." (Pl. Ex. C, Supp. Plan 1st Am. ¶ 1).

17. The Retirement Review Committee has adopted at least three rules in regard to the Supp. Plan. (Def. Ex. 5). The Rule involving breaks in service provides as follows:

> The employment must have been continuous service, which means that it must have been continuous paid full-time employment without interruption as said terms historically have been interpreted pursuant to the provisions of the Retirement Plan for Chicago Transit Authority Employees. All separations from employment which are not followed by reinstatement within one year or breaks in service between eligible governmental employers of more than one year shall interrupt continuous service and shall result in the loss of all prior employment

---

[3] Rest. refers to Restatement of the Chicago Transit Authority Supplemental Retirement Plan.

credit. Service of less than one year at eligible governmental employers shall not be considered in the computation of continuous service with an eligible governmental employer and shall be viewed as a break in service.

(Def. Ex. 5, Rule No. 1, (b)). This Rule No. 1 was adopted on April 25, 1985 and was amended on August 14, 1985 and December 10, 1985.

## D. Authorization Of Amendments And Restatements Of The Retirement Plan And Supplemental Plan

18. CTA Ordinance No. 90-232 is titled: "AN ORDINANCE AUTHORIZING THE AMENDMENT AND RESTATEMENT OF THE CHICAGO TRANSIT AUTHORITY SUPPLEMENTAL RETIREMENT PLAN AND THE CHICAGO TRANSIT AUTHORITY RETIREMENT PLAN FOR CHICAGO TRANSIT BOARD MEMBERS." (Def. Ex. 1).

19. The Chicago Transit Board of CTA ordained the Chairman of the Chicago Transit Board with the authority "to execute and effectuate amendments and restatements" of the Supp. Plan and Retirement Plan "to effectuate the following principles" in part:

> To provide for the Authority to maintain a standard plan document setting forth the terms of each Plan and for individuals to participate in each such standard plan by the execution of a joinder agreement, in lieu of the Authority executing and maintaining an individual contract with each employee and Board member to effectuate participation in the Plans.

(Def. Ex. 1, § 1 (E)).

> To provide that individuals participating in the Plans shall not incur any reduction in benefits earned under the Plans as a *result of the amendment and restatement* of the Plans consistent with this ordinance.

(Def. Ex. 1, § 1 (F)) (Emphasis added).

20. Both the Restatement of the CTA Supp. Retirement Plan and the First Amendment to the Restatement of the CTA Supp. Retirement Plan were duly signed by the Chairman of the Chicago Transit Board. (Pl. Ex. C, Bosco Rest.[4] and Bosco Supp. Plan 1st Am.[5])

## E.     Bridge Of Service Under Retirement Plan And Supp. Plan

21. Each of the class members has worked at the CTA at two different time periods, and is seeking to bridge their periods of service for purposes of receiving benefits under the Retirement Plan and the Supp. Plan. (Def. Ex. 4). For example, Ronald T. Bosco, the named plaintiff, is an attorney who worked for the CTA from 1961 until 1967 and then again from 1990 until he retired in 1997. (Pl. Ex. A, Bosco Aff. ¶ 3). The other class members have similar service breaks. (Def. Ex. 4). Plaintiff Bosco asserts that he is entitled to receive benefits not only for the period from 1990 until 1997, which the CTA does not dispute, but also for his earlier tenure with the CTA. Similar claims exist for the other class members.

22. The Retirement Plan does not provide for any bridging of service. Rather, benefits under the Retirement Plan are calculated based on "continuous service," with certain limited exceptions which are not applicable here. (Def. Ex. 3, ¶ 3.7).

23. Benefits under the Supp. Plan are also generally based on continuous service with the CTA as defined in the Retirement Plan. (Pl. Ex. C, Rest., ¶ 5). The Supp. Plan also

---

[4] Bosco Rest. refers to the Restatement of the Chicago Transit Authority Supplemental Retirement Plan signed by Mr. Bosco dated January 24, 1991.

[5] Bosco Supp. Plan 1st Am. refers to the First Amendment to the Restatement of the Chicago Transit Authority Supplemental Retirement Plan signed by Mr. Bosco dated January 24, 1991.

provides benefits for previous "government service," that is, service with the CTA and certain other governmental bodies that give reciprocal pension credit, but only if there is no more than a 12-month break between the employee's prior service with the governmental body and his service with the CTA. (Pl. Ex. C, Rest. ¶ 2(f), Supp. Plan 1ˢᵗ Am. ¶ 1).

24. The parties agree that under the terms of the Retirement Plan, the Supp. Plan and the Retirement Review Committee Rules, none of the class members would be entitled to bridge his prior service with the CTA, because each had been away from the CTA or other governmental reciprocating agency for more than one year.

25. The dispute centers on the legal significance of the second revision to Administrative Procedure 135 dated July 11, 1991 ("1991 AP 135") (Pl. Ex. H) and the third revision to Administrative Procedure 135 dated May 5, 1992 ("1992 AP 135") (Pl. Ex. R).

**F.     CTA Administrative Procedures**

26. As part of the ordinary course of business at the CTA, the CTA would issue certain policies and other directives commonly referred to as an Administrative Procedure or an "AP." Various departments of the CTA would review the AP prior to its issuance. The AP may be reviewed by the legal department if the legal department is requested to do so or if the AP comes to the legal department's attention. (Pl. Ex. J, pg. 36-37). APs are not adopted by the Board or by means of an ordinance.

**G.     1986 AP 135**

27. Pursuant to AP 135 issued by the Personnel Administration Department of the

CTA, the CTA enabled full-time permanent exempt employees of the CTA, upon application and approval, to bridge and apply periods of continuous service at the CTA or other qualified agencies in determining the number of years of service for computing benefits affected by longevity other than retirement benefits. (Def. Resp. ¶ 17; Pl. Ex. C, Rest. pg. 1, ¶ 2(f)(ii)(b), 2(f)(iv), 5, 6, Supp. Plan 1st Am. ¶ 1). Bridging of service for purposes of retirement benefits is governed by the terms of the Supp. Plan. (Pl. Ex. C, Rest. pg. 1, ¶ 2(f)(ii)(b), 2(f)(iv), 5, 6, Supp. Plan 1st Am. ¶ 1).

28. The CTA Personnel Administration Department issued AP 135 in 1986 ("1986 AP 135") which explains the procedure to be followed when a full-time permanent exempt employee applies to bridge prior public service with an eligible agency to CTA service, and earns an adjusted service date ("ASD"). (Pl. Ex. H). ASD is defined as "the date which includes service credits earned while employed at eligible agencies and is used in determining the number of years of continuous service when computing benefits that are affected by longevity." (Pl. Ex. H). 1986 AP 135 reads in pertinent part:

> Continuous service shall mean continuously paid full-time employment without interruption. All separations not followed by reinstatement within one year, or breaks in service between eligible agencies of more than one year computed on a calendar year basis, shall interrupt continuous service and shall result in the loss of all prior service credit.

(Pl. Ex. H, ¶ E).

> Employees whose bridge of service has been approved, and who have been placed at Level 17 or above, may apply their bridge of service to the Supplemental Retirement Plan available to employees at that level. The Employee Retirement Review Committee notifies the employee at the time of

eligibility for application.

(Pl. Ex. H, ¶ J).

29. Plaintiffs could not bridge their prior service with eligible agencies for purposes of calculating benefits affected by longevity other than retirement benefits because there was a break in continuous service that was greater than one year. (Pl. Ex. H; Def. Ex. 3, pg. 4; Pl. Ex. C, Rest. pg. 3, 5, Supp. Plan 1st Am. ¶ 1; Def. Ex. 5, Rule No. 1, ¶ (b)). Plaintiffs could not bridge their prior service with eligible agencies for purposes of calculating retirement benefits because of the terms of the Retirement Plan, Supp. Plan and Retirement Review Committee Rules. (Def. Ex. 3, pg. 4; Pl. Ex. C, Rest. pg. 3, 5, Supp. Plan 1st Am. ¶ 1; Def. Ex. 5 Rule No. 1, ¶ (b)).

**H.     1991 AP 135**

30. The CTA Personnel Administration Department amended AP 135 on or about January 10, 1991 ("1991 AP 135") to read in part:

> Continuous service shall mean continuously paid full-time permanent employment without interruption. All separations not followed by reinstatement within one year, or breaks in service between eligible agencies of more than one year computed on a calendar year basis, shall interrupt continuous service and shall result in the loss of all prior service credit. *However, prior CTA full-time permanent employment shall be bridged without regard to length of separation.*

(Pl. Ex. L, ¶ C). (Emphasis added).

> Employees whose bridge of service has been approved, and who have been placed a Level 17 or above, may apply their bridge of service to the Supplemental Retirement Plan available to employees at that level. The Employee Retirement Review Committee notifies the employee at the time of eligibility for application.

(Pl. Ex. L, ¶ I).

    31. The procedure for bridging of service is as follows:

> 1. The employee completes a Bridge of Service Application form and forwards it along with documentation regarding prior employment;
> 2. Personnel Administration reviews the documents submitted by the employee, makes a recommendation regarding the application, signs the application and forwards it to the Deputy Executive Director, Human Resources;
> 3. The Deputy Executive Director, Human Resources, disapproves or approves recommendation, signs the form and returns it to Personnel Administration;
> 4. Personnel Administration distributes copies of the completed form and sends it to the Executive Director of the Retirement Allowance Committee.

(Def. Resp. ¶ 24).

    32. APs were often reviewed by the legal department. (Pl. Ex. A, D pg. 9-10, E pg. 14-16, 25, F pg. 27-28, G pg. 16, I pg. 2). Based on this prior history of development of APs, 1991 AP 135 was reviewed by the legal department. (Pl. Ex. A, D pg. 9-10, E pg. 14-16, 25, F pg. 27-28, G pg. 16, I pg. 2). Alfred Savage, the President the of CTA, signed the 1991 AP 135; however, the AP was not adopted by an ordinance of the Board or through collective bargaining measures. (Pl. Ex. I pg. 2; Def. Resp. ¶ 25; CTA's St. of Add. Facts ¶ 17;[6] Pl. Ex. E pg. 47).

## I.    Bridge of Service Application

    33. Plaintiffs completed a Bridge of Service Application and CTA personnel administrators approved and signed the bridge of service for purposes of benefits affected by longevity, other than retirement benefits. (Pl. Ex. M; Pl. Ex. F pg. 36-37; Pl. Ex G pg. 48).

---

[6] "CTA's St. of Add. Facts" refers to The CTA's Statement of Additional Facts In Support of Its Trial Brief.

Neither the Allowance Committee nor the Retirement Review Committee ever approved the bridges of service for retirement benefits. (Pl. Ex. M; Pl. Ex. F pg. 36-37).

34. Following the approval of the bridge of service application, Plaintiffs received an adjusted date of service. (Def. Resp. ¶ 29).

35. Some Plaintiffs then received a memorandum from the CTA regarding bridging of service under the Supp. Plan. The memorandum stated "the Supplemental Retirement Plan allows for the "bridging" of certain previously qualified governmental service." (Pl. Ex. N). However, the memorandum does not state that the CTA approved Plaintiffs' bridge of service for purposes of retirement benefits. Furthermore, in a separate memorandum, the CTA instructed Plaintiffs to submit verification of employment dates, among other items, to the CTA in order to process the bridge of service application. (Pl. Ex. N). Once again, the CTA did not approve the bridge of service application for purposes of retirement benefits in this memorandum.

36. Some Plaintiffs submitted their prior CTA employment information to the CTA. In some cases, the Retirement Review Committee computed and prepared spreadsheets showing a payment plan; however, these were not distributed to the Plaintiffs. The Plaintiffs were and are ready, willing and able to contribute these amounts to the CTA. (Def. Resp. ¶ 32, 33; Pl. Ex. A).

J.      **1992 AP 135**

37. In May, 1992, the CTA Personnel Administration Department amended the 1991

AP 135 with respect to bridge of service. The amended AP 135 provides in pertinent part:

> Continuous service shall mean continuously paid full-time permanent employment without interruption. All separations not followed by reinstatement within one year, or breaks in service between eligible agencies of more than one year computed on a calendar year basis, shall interrupt continuous service and shall result in the loss of all prior service credit.

(Def. Resp. ¶ 34; Pl. Ex. R, ¶ C).

> Full-time permanent exempt employees Level 17 or above, whose bridge of service has been fully approved under AP 135, may apply to the Employee Retirement Review Committee to have their bridge of service applied to their retirement benefits. The Employee Retirement Review Committee will review this application and, based on its rules, will either grant or deny the request to bridge service for determining the eligibility for, and the amount of supplemental retirement benefits. The Employee Retirement Review Committee, not the CTA, shall have the sole discretion to grant or deny requests to bridge service for retirement benefits.

(Def. Resp. ¶ 34; Pl. Ex. R, ¶ I).

38. Prior to the issuance of 1992 AP 135, the legal department, and various other departments reviewed it. Furthermore, the president of the CTA signed the 1992 AP 135. (Def. Resp. ¶¶ 35-36).

39. 1992 AP 135 removed the provision regarding bridging of service for prior CTA full-time permanent employees without regard to length of separation; clarified the proper procedure to follow when seeking a bridge of service for retirement benefits; and emphasized that the Retirement Review Committee would have the final determination whether the bridge of service would apply to the employee's retirement benefits. (Pl. Ex. C, Rest. pg. 1-7; Pl. Ex. R).

40. In May, 1992, the Retirement Review Committee issued a memorandum stating that prior CTA service could not be bridged, because the break in service was greater than a year. (Def. Ex. 6).

41. Therefore, each of the Plaintiffs has been awarded, or will be awarded, a Retirement Allowance calculated using the start date for their second period of service. (Def. Resp. ¶ 43).

42. None of the Plaintiffs retired during the period between the adoption of 1991 AP 135 and 1992 AP 135.

**K.    Procedural History**

43. Plaintiffs originally filed their complaint in the Circuit Court of Cook County, Case Number 98-CH-08594; however, the CTA removed the case to Federal Court on July 29, 1998. Both parties agreed to a trial on the papers and oral arguments were heard before this Court on September 25, 2001.

## II. ISSUES PRESENTED

The central issue presented to this Court is whether 1991 AP 135 created a property interest which the CTA could not destroy by means of 1992 AP 135. For the following reasons, this Court holds that 1991 AP 135 did not create a property interest.

## III. CONCLUSIONS OF LAW

**A.    Jurisdiction**

This action arises under 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. 42 U.S.C. § 1983 provides a remedy for violations of constitutional rights and

rights created by federal statute. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502 (1980). 42

U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Municipalities and other local governments may be sued for damages, as well as

declaratory and injunctive relief under a Section 1983 theory, whenever

> the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover . . . local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's decisionmaking channels.

*Monell v. Department of Social Services*, 436 U.S. 658, 690-91, 98 S.Ct. 2018 (1978). Both

parties agree the CTA is a duly organized body politic and corporate and a political subdivision

of the State of Illinois created and existing under the Metropolitan Transit Authority Act;

therefore, as a municipality the CTA may be sued under a Section 1983 theory.

In order to establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must allege

two elements: 1) the action occurred "under color of law" and 2) the action is a deprivation of

either a constitutional right or a federal statutory right. *Parratt v. Taylor*, 451 U.S. 527, 535,

101 S.Ct. 1908 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S.

327, 330-31, 106 S.Ct. 662 (1986).  Section 1983 is available to enforce violations of the

Constitution and federal statutes by agents of the state. *Maine*, 448 U.S. at 4.

Plaintiffs allege in relevant part: "Acting under color of law, the Defendant has deprived Bosco and all others similarly situated of their property rights in violation of the Fourteenth Amendment to the United States Constitution, and caused Plaintiff and all other[s] similarly situated to suffer damages." Pl. Comp. ¶ 49. Additionally, in Plaintiff's prayer for relief, Plaintiff asked this Court to declare that the CTA's calculation of benefits "deprived [Plaintiffs] of their property rights in violation of the Fourteenth Amendment to the United States Constitution." *Id.* pg. 12, ¶ (i). Furthermore, the CTA does not dispute that Plaintiffs have brought a claim for violation of Section 1983, 42 U.S.C. § 1983. Def. Letter to Court dated Oct. 1, 2001.

The first step in analyzing a due process claim requires a determination of whether the plaintiff has a constitutionally protected interest, in this case, a property interest. *Morris v. New York Employees' Retirement System*, 129 F.Supp.2d 599, 606 (S.D.N.Y. 2001). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694 (1972). A legitimate claim of entitlement means more than a unilateral expectation or abstract desire for it. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701 (1972). The entitlement must be "securely and durably yours . . . as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Wallace v.*

*Robinson*, 940 F.2d 243, 246 (7th Cir. 1991). For example, the *Morris* Court found an employee who brought a Section 1983 claim had a property interest in the right to receive benefits of his membership in the New York City Employees Retirement System. *Morris*, 129 F.Supp.2d at 606-07.

The types of property interests protected by the Due Process Clause are not defined by the Constitution itself, but are instead "defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 606 quoting *Board of Regents*, 408 U.S. at 577. The pension provision of the Illinois Constitution, article XIII, § 5, is based on the pension provision of the New York Constitution, article V, § 7. The Second Circuit has repeatedly found property rights exist under city or state pension plans and are protected under the New York Constitution. *Id.* Thus, this Court finds that Plaintiffs have a property interest claim in their CTA pension benefits and, therefore, satisfy the requirements to bring a Section 1983 claim.

## B. The CTA

The CTA was created pursuant to the Metropolitan Transit Authority Act, 70 ILCS 3605/1 *et seq.* The CTA is a special district under Illinois law. *See Chicago Transit Auth. v. Danaher*, 353 N.E.2d 97, 99-101 (1st Dist. 1976). Therefore, under Article VII, section 8 of the Illinois Constitution, which adopts the traditional Dillon's rule for special districts and certain other local government, the CTA "shall only have powers granted by law." Ill. Const.

Art. 7, § 8. The "governing and administrative body of" the CTA is the seven-member Chicago Transit Board. 70 ILCS 3605/19.

## C.    Section 22-101 of the Illinois Pension Code

In accordance with the Illinois Pension Code, the CTA provides pension and retirement plans for its employees through the Retirement Plan and the Supp. Plan. Both plans were adopted under the authority given the CTA in section 22-101 of the Illinois Pension Code, 40 ILCS 5/22-101, effective July 1, 1963.

Section 22-101 describes only two ways in which a pension plan may be modified: 1) "from time to time by ordinance of the Chicago Transit Board" or, 2) to the extent the plan covers members of a labor organization, "by agreements with such labor organization." Section 22-101 provides in pertinent part:

> Metropolitan Transit Authority Pension Fund. There shall be established and maintained by the Authority created by the "Metropolitan Transit Authority Act", approved April 12, 1945, as amended, a financially sound pension and retirement system adequate to provide for all payments when due under such established system *or as modified from time to time by ordinance of the Chicago Transit Board*. For this purpose, both the Board and the participating employees shall make such periodic payments to the established system as may be determined by such ordinance ... Provisions shall be made by the Board for all Board members, officers and employees of the Authority appointed pursuant to the "Metropolitan Transit Authority Act" to become, subject to reasonable rules and regulations, members or beneficiaries of the pension or retirement system with uniform rights, privileges, obligations and status as to the class in which such officers and employees belong. *The terms, conditions and provisions of any pension or retirement system or of any amendment or modification thereof affecting employees who are members of any labor organization may be established, amended or modified by agreement with such labor organization.*

40 ILCS 5/22-101. (Emphasis added).

The Retirement Plan similarly provides that it "is part of the Wage and Working Conditions Agreement between" the CTA and the unions representing its employees, and that it "can be changed only in accordance with the provisions of the aforesaid Wage and Working Conditions Agreement." Def. Ex. 3, ¶ 23.1.

## D.    The Retirement Plan and The Supplemental Plan

The Retirement Plan is the subject of collective bargaining between the CTA and the various unions representing its rank and file employees, but it covers all CTA employees whether union members or not, who meet its requirements. The Supp. Plan, by contrast, was created by ordinance to provide certain additional benefits for executive employees above a certain grade level. Plaintiffs are or were executive employees of the CTA and participants in both the Retirement Plan and the Supp. Plan.

Both the Retirement Plan and the Supp. Plan create committees to oversee such things as an applicant's eligibility for benefits and deciding questions arising in the administration, interpretation and application of the plan. Def. Ex. 3, ¶¶ 5.6(2), 5.6(3); Pl. Ex. C, Rest. ¶ 5. Furthermore, the Chicago Transit Board of the CTA ordained the Chairman of the Board with the authority "to execute and effectuate amendments and restatements" of the Supp. Plan and Retirement Plan.

## E.    1991 AP 135 did not comply with Section 22-101

As stated above, section 22-101 allows pension plans to be modified in two ways: by ordinance or through collective bargaining. 1991 AP 135 does not fall into either category.

1991 AP 135 was not an ordinance and the Chicago Transit Board never approved it. Additionally, 1991 AP 135 was not the subject of an agreement with any of the CTA's labor unions. Therefore, because 1991 AP 135 did not satisfy the modification requirements of section 22-101, it did not amend the Retirement Plan or the Supp. Plan. Thus, 1991 AP 135 did not entitle Plaintiffs to bridge their prior CTA service.

Moreover, section 22-101 requires pensions maintained by the CTA to be "financially sound" and to "provide for all payments when due." The statute does not permit the CTA management to make changes to a CTA pension, using an Administrative Procedure, without approval of the Board or through collective bargaining. Allowing CTA management to bypass section 22-101 and alter CTA pensions could jeopardize the financial soundness of the pension plan and the ability of the CTA to provide for all payments when due.

At oral arguments, this Court asked both Plaintiffs and the CTA the meaning of the following sentence of section 22-101 of the Illinois Pension Code: "Provisions shall be made by the Board for all Board members, officers and employees of the Authority appointed pursuant to the 'Metropolitan Transit Authority Act' to become, subject to *reasonable rules and regulations*, members or beneficiaries of the pension or retirement system with uniform rights, privileges, obligations and status as to the class in which such officers and employees belong." (Emphasis added). In particular, this Court asked whether 1991 AP 135 might be considered a reasonable rule or regulation under this sentence.

The CTA responded that the sentence should be read to refer to rules and regulations

adopted by the Board or under authority delegated by the Board or pursuant to the terms of a plan adopted pursuant to section 22-101. The Plaintiffs stated that 1991 AP 135 is considered a reasonable rule or regulation under section 22-101.

This Court finds that 1991 AP 135 is not a reasonable rule or regulation under section 22-101because it was not adopted by the Board or under authority delegated by the Board pursuant to the terms of a plan. The sentence in question clearly states that the "Board" is to make provisions for all Board members, officers and employees of the CTA to become members or beneficiaries of the pension or retirement system. Section 22-101 then expresses the Board is to implement this task using "reasonable rules and regulations."

The Board has fulfilled its requirements to implement a pension or retirement system by establishing the Retirement Plan and Supp. Plan. The Retirement Plan authorizes the Allowance Committee the "power ... to make and enforce such rules and regulations consistent with the provisions of this agreement as in its opinion may be necessary, or desirable, for the carrying out of its duties, and for the efficient administration of the Plan." Def. Ex. 3, ¶ 5.6(1). Similarly, the First Amendment to the Supp. Plan gives the Retirement Review Committee power to adopt rules interpreting the term Governmental Service. Pl. Ex C, Bosco Supp. Plan 1st Am. ¶ 1.

Therefore, under the terms of the Retirement Plan and the Supp. Plan, their respective committees were delegated authority to adopt rules and regulations consistent with the terms of the Plans. Pursuant to this authority, the Retirement Review Committee adopted a rule

confirming, consistent with the terms of the Supp. Plan, that "[a]ll separations from employment which are not followed by reinstatement within one year or breaks in service between eligible governmental employers of more than one year shall interrupt continuous service and shall result in the loss of all prior employment credit." Def. Ex. 5, Rule No. 1, ¶ (b).

## F. Promulgation of 1991 AP 135 By The CTA's President and Legal Department Did Not Change The Terms Of The Retirement Plan Or Supplemental Plan

Plaintiffs contend the signature of Alfred Savage, the CTA's President, and the review by the legal department of 1991 AP 135 authorized 1991 AP 135 to amend the Retirement Plan and Supp. Plan allowing Plaintiffs to bridge their service. The signature of the President and review by the legal department, however, did not modify the Retirement Plan or Supp. Plan.

Rather, under Illinois law, "[i]t is the general rule that when the legislature grants to a municipal corporation power to do any act and prescribes the manner in which the power shall be exercised, the power must be exercised in the manner stated and not otherwise." *Gray v. W.A. Black Co.*, 170 N.E. 713, 716 (Ill. 1930) (holding ordinance that did not strictly conform to the requirement of the Local Improvement Act void); *see also Booth v. Corn Products Co.*, 292 N.E.2d 149, 152 (1st Dist. 1972) (holding the Sanitary District, absent an ordinance providing for compensation, lacked the right to seek compensation for the handling of excess discharge); 2A *McQuillin's Law of Municipal Corporations* § 10.27, at 391 (3d ed. 1996) ("Where the applicable law directs in precise or definite terms the manner in which certain corporate acts are to be executed, and points out the departments, officers or agents who are

to perform them, such specification must be substantially followed. . .The direction of definite and certain method of procedure in the grant of power to municipal authorities generally excludes all other methods by implication of law.")

In this case, the manner prescribed by the legislature to amend the pension plan of the CTA was by means of an ordinance or through collective bargaining. Because the legislature did not grant the CTA the power to amend the pension plan via an administrative procedure, neither can this Court.

Additionally, "when an employee of a municipal corporation purports to bind the corporation by contract without prior approval, in violation of an applicable statute, such a contract is utterly void," and not merely voidable. *D.C. Consulting Eng'rs, Inc. v. Batavia Park Dist.*, 492 N.E.2d 1000, 1002 (2d Dist. 1986) (holding contract void because park district superintendent was without authority to bind the park district in the absence of prior approval by park district board in accordance with the statute); *see also South Suburban Safeway Lines, Inc. v. Regional Transportation Authority*, 519 N.E.2d 1005, 1009-10 (1st Dist. 1988)(finding noncompliance with provision of Regional Transportation Authority Act requiring affirmative vote of at least five of RTA's nine directors for approving any contract, rendered express contract void and precluded any finding of implied contract binding RTA to pay transit company); *Bank of Pawnee v. Joslin*, 521 N.E.2d 1177, 1186 (4th Dist. 1988) (holding the village was not estopped to deny the unenforceability of the alleged contracts because neither the village clerk or manager were granted authority to bind the village to a contract and such

contracts were subject to final approval by the village board).

Apparent authority is not sufficient to bind a municipal corporation. *Heritage Commons Partners v. Village of Summit*, 730 F. Supp. 821, 823 (N.D. Ill. 1990) (Posner, J., sitting by designation)(holding village could be liable under Illinois law for breach of an agreement to proceed with residential development project which was conditioned on HUD approval of grants for that project and a shopping center). Furthermore, "[o]ne who deals with a municipal corporation is presumed to know the extent of its power to contract." *D.C. Consulting Eng'rs*, 492 N.E.2d at 1002. Therefore, President Savage's signature and the legal department's review of 1991 AP 135 was insufficient to change the terms of the Retirement Plan or Supp. Plan.

Throughout oral arguments, when Plaintiffs were asked who or what gave 1991 AP 135 the authority to modify the Retirement Plan or Supp. Plan to allow the bridge of service, Plaintiffs' answer was "common-sense." When the CTA was asked why 1991 AP 135 did not operate to modify the Retirement Plan or Supp. Plan to allow the bridge of service, CTA's answer was section 22-101 of the Pension Code.

Unfortunately for the Plaintiffs, this Court can not decide a case on a "common-sense" theory, but must look to statutory interpretation and established case law. This Court established *supra*, through the use of case law guidelines and statutory interpretation that the only way to modify the Retirement Plan and Supp. Plan was by ordinance or through collective bargaining measures. The case law supports this interpretation. A contract executed by a

municipal employee purporting to bind the corporation to the contract without prior approval and in violation of an applicable statute is void. *D.C. Consulting Eng'rs, Inc.*, 492 N.E.2d at 1002.

## G.    The Illinois Constitution Does Not Provide A Basis For Plaintiffs' Claim

The Illinois Constitution provides, "membership in any pension or retirement system of the State, any unit of local government or school district, or any agency of instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Article XIII, Section 5, Illinois Constitution of 1970. The Illinois Supreme Court found, "[t]he plain language of the pension protection clause makes participation in a public pension plan an enforceable contractual relationship and also demands that the 'benefits' of that relationship 'shall not be diminished or impaired.'"*People ex rel. Sklodowski v. State*, 695 N.E.2d 374, 377 (Ill. 1998). In other words, a participant is entitled to a pension based on the status of the system when his rights in the system vested, either at the time he entered the system or in 1971 when the 1970 Constitution became effective, whichever is later. *Kraus v. Board of Trustees of the Police Pension Fund of the Village of Niles*, 390 N.E.2d 1281, 1284-85 (Ill. App. Ct. 1979). "The purpose of the provision is essentially to lock in an employee's pension rights as they are stated under the employment contract, or as they exist by statute." *Kastel v. Winnetka Board of Education*, 946 F.Supp. 1329, 1342 (N.D. Ill. 1996).

Plaintiffs argue the Illinois pension provision requires the CTA to accept Plaintiffs

bridge of service applications based on 1991 AP 135. Plaintiff's argument on this point assumes that 1991 AP 135 actually established one of the terms of the CTA's retirement benefits which was later undone by 1992 AP 135. As this Court has explained, 1991 AP 135 had no such effect, because it was not adopted by an ordinance or by collective bargaining.

Plaintiffs cite cases holding pension benefits may not be diminished retroactively; however, those cases are distinguishable from the case at hand because the cited cases involve duly enacted statutes, ordinances or public acts. *E.g.*, *Felt v. Board of Trustees of Judges Ret. Sys.*, 481 N.E.2d 698 (Ill. 1985); *Kraus*, 390 N.E.2d 1281; *Miller v. The Retirement Board of Policemen's Annuity and Benefit Fund of the City of Chicago*, No. 1-00-1549 (Ill. App. Ct. Oct. 15, 2001). By contrast, 1991 AP 135 was not enacted by ordinance or adopted by collective bargaining. This is the crucial distinction.

## IV. CONCLUSION

Plaintiffs' attempt to bridge the service chasm fails because 1991 AP 135 was not adopted by means of an ordinance or collective bargaining. As a result, Plaintiffs did not have a property interest which was taken away by means of 1992 AP 135. The CTA has not violated either the United States or Illinois Constitution by denying Plaintiffs' bridge of service applications. **Accordingly, this Court directs the Clerk of the Court to enter judgment, plus court costs, in favor of the CTA and against Plaintiffs on Plaintiffs' complaint. SO ORDERED THIS 18TH DAY OF OCTOBER 2001.**

*Morton Denlow*

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies delivered in open court or mailed to:**

Daniel R. Fusco
Robert L. Pattullo, Jr.
John J. Rock
Rock, Fusco & Garvey, Ltd.
350 N. LaSalle Street, Suite 900
Chicago, Illinois 60610

Charles F. Regan, Jr.
Mayer, Brown & Platt
190 South LaSalle Street
Chicago, Illinois 60603

Counsel for Plaintiffs

Counsel for Defendant